UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSEPH CORNETTA,

                            Plaintiff,

            v.

TOWN OF HIGHLANDS; VILLAGE OF
HIGHLAND FALLS; JOSEPH D'ONOFRIO,
*individually and as Mayor of the Village of
Highland Falls*; KENNETH SCOTT,
*individually and as Chief of Police*; JAMES
DISALVO, *individually and as Deputy Mayor of
the Village of Highland Falls*; FRANK PIERRI,
*individually and as Chief of Police of the Town
of Highlands*,

                            Defendants.

No. 18-CV-12070 (KMK)

OPINION & ORDER

Appearances:

Joseph Christopher Albanese, Esq.
Michael Patrick Hilferty, Esq.
White, Hilferty & Albanese P.C.
New York, NY
*Counsel for Plaintiff*

Kenneth Ethan Pitcoff, Esq.
Cristina A. Knorr, Esq.
Michael Adam Czolacz, Esq.
Morris Duffy Alonso & Faley
New York, NY
*Counsel for Defendants Village of Highland Falls, Joseph D'Onofrio, Kenneth Scott, and James
DiSalvo*

KENNETH M. KARAS, United States District Judge:

        Joseph Cornetta ("Plaintiff") brings this Action against Defendants Town of Highlands

(the "Town"), Village of Highland Falls (the "Village"), Joseph D'Onofrio ("D'Onofrio"),

Kenneth Scott ("Scott"), James DiSalvo ("DiSalvo"), and Frank Pierri ("Pierri") (collectively,

"Defendants"), alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, *et seq.*, claiming that Defendants discriminated and retaliated against Plaintiff based on a purported disability and that Defendants participated in wire and mail fraud in furtherance of an alleged illegal enterprise. Before the Court is a Motion To Dismiss the Amended Complaint (the "Motion"), pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6), submitted by the Village, D'Onofrio, Scott, and DiSalvo (collectively, "Moving Defendants" or "Village Defendants"). (*See* Not. of Mot. (Dkt. No. 20).) For the reasons discussed below, the Motion is granted.

## I. Background

### A. Factual Background

The following facts are taken from the Amended Complaint and assumed to be true for the purposes of this Motion. (*See* Am. Compl. (Dkt. No. 7).)

The individual Parties involved in this Action are: Plaintiff, a purportedly disabled police officer for the Town and subsequently a detective in the Village's Police Department, (Am. Compl. ¶ 11), D'Onofrio, the Village's mayor, (*id.* ¶ 14), Scott, the chief of the Village's Police Department, (*id.* ¶ 15), DiSalvo, the Village's deputy and/or assistant mayor, (*id.* ¶ 16), and Pierri, the Town's former deputy chief of police, (*id.* ¶ 17).[1]

Plaintiff was hired by the Town as a police officer in 2014 and was promoted to serve as a detective for the Village in 2016. (*Id.* ¶ 18.) In 2016, Jack Quinn, then a Village police chief,

---

[1] Pierri, who is not part of the group of individual Defendants defined as "Village Defendants," does not join this Motion, and neither does the Town. (*See* Village Defs.' Reply Mem. in Supp. of Mot. ("Defs.' Reply Mem.") 9 (Dkt. No. 24).)

asked Plaintiff to review the work of Plaintiff's predecessor, Randall Bailey ("Bailey").  (*Id.*

¶ 20.)  Plaintiff discovered that Bailey allegedly had failed to take "any meaningful action" in

investigating a burglary, and Plaintiff subsequently finished the investigation, culminating in a

number of arrests, after which Quinn directed Plaintiff to review and close all of Bailey's cases.

(*Id.*)  Plaintiff alleges that Bailey was displeased with that direction and retaliated against

Plaintiff by "discrediting him and smearing his reputation in the Town and the Village."  (*Id.*)

Plaintiff further alleges that during the course of the arrests in the burglary, Plaintiff discovered

that one of the arrestees was the nephew of D'Onofrio, the Village's mayor.  (*Id.*)  During

questioning of another suspect, Scott, the then-Chief of the Village's Police Department,

allegedly requested that Plaintiff meet with the suspect's father.  (*Id.*)  Plaintiff agreed to meet

with him, but the suspect's father allegedly used that meeting to discover the names of individual

witnesses and went on to intimidate and threaten them.  (*Id.*)

Plaintiff also alleges that over the course of his investigations, he discovered that the

owner of a motel in the Village was induced to provide a $10,000 cash bribe to D'Onofrio to

facilitate the approval of a modification to the motel.  (*Id.* ¶ 21.)

In early 2017, Patrick Flynn ("Flynn") ousted D'Onofrio as the mayor in the Village, and,

concurrently, Scott had also allegedly been suspended from his position as the Village's Police

Chief.  (*Id.* ¶ 22.)  Plaintiff alleges that this removal was pursuant to "an irrevocable Letter of

Retirement," signed to settle a disciplinary hearing against Scott, which included claims that

Scott failed to provide adequate firearm training for police department employees, failed to open

an investigation of a citizen complaint regarding D'Onofrio, and improperly issued a handgun to

a police officer trainee without providing the trainee with proper police credentials.  (*Id.*

¶¶ 78(a)–(b).)  Following the election, the Town and Village boards collaborated to form a Joint

Special Investigations Unit ("SIU") and appointed Plaintiff as the head. (*Id.* ¶ 22.) During Flynn's tenure as mayor, Plaintiff, through input from members in the community, allegedly discovered that D'Onofrio and the Village's police department engaged in "shakedowns" of local business owners and thefts of funds from the local senior citizens' center and uncovered "documents showing evidence of fraud regarding federal grants." (*Id.*) In the spring of 2017, Plaintiff also allegedly received complaints of threats and harassment conducted by Scott's son and more complainants "in the case against [] D'Onofrio." (*Id.* ¶¶ 23–24.) Plaintiff also alleges that around this time, he received a warning from the then-interim chief of the Village's police department that the Village's police officers "were tracking his movements in the SIU." (*Id.* ¶ 25.)

Plaintiff alleges that, in March 2017, Plaintiff drove by D'Onofrio's liquor store, with a criminal informant in the passenger seat, and ran into Scott. (*Id.* ¶ 26.) Plaintiff alleges that Scott "charged out of the liquor store" and started walking towards Plaintiff's patrol vehicle, screaming, "Yeah, what, what, what!" (*Id.*) Several days later, on mayoral election day, according to Plaintiff, Scott parked his minivan next to Plaintiff's vehicle, "nodded his head, smiled, and drove away." (*Id.*) Plaintiff then allegedly learned that Scott, D'Onofrio, and "various other Village actors—including several known-drug dealers—were intimidating voters near a polling station." (*Id.*) To investigate these claims, Plaintiff parked his car across from the street from Scott, and Scott and his associates allegedly "began to wave and shout insults at" Plaintiff. (*Id.*) According to Plaintiff, Scott approached Plaintiff's car, called Plaintiff a "dirty cop," and said that Plaintiff was "going down" while a "known-local drug dealer" recorded the incident and posted the video to his Facebook page. (*Id.*)

D'Onofrio subsequently won the mayoral election. (*Id.*) Plaintiff alleges, upon information and belief, that Defendants committed voter fraud in order to win re-election, using fraudulent absentee ballots in their endeavor to get D'Onofrio re-elected and continue "their reign of intimidation, extortion[,] and retaliation." (*Id.* ¶¶ 27–30.) Plaintiff further alleges that, after the election, D'Onofrio, in violation of the "irrevocable Letter of Retirement," reinstated Scott as the chief of the Village's police department "without approval or a vote by the Board of Trustees." (*Id.* ¶ 78(b).) Although D'Onofrio made public statements acknowledging that Scott was not permitted to have a firearm or carry a police badge, in practice, D'Onofrio allegedly permitted Scott to continue doing so. (*Id.* ¶¶ 78(b)–(c).)

Plaintiff claims that, on April 3, 2017, he sustained an injury on duty. (*Id.* ¶ 32.) Specifically, Plaintiff alleges that while performing a "day tour" for the Town, Plaintiff parked his patrol vehicle in the Town police department's driveway for a smoking break. (*Id.*) Scott pulled into the driveway and then exited his vehicle, allegedly shouting, "I'm here for my car. Get your shit out of it!" (*Id.*) Plaintiff advised Scott not to enter the car because there were confidential case materials in it. (*Id.*) Scott allegedly continued to circle the car and eventually took the vehicle's keys—of which Scott also had a copy—to the car from his pocket, despite Plaintiff's protests. (*Id.*) Plaintiff approached Scott and the vehicle to prevent Scott from opening the door, and Scott allegedly "struck" Plaintiff's right arm to push him away. (*Id.*) Plaintiff managed to shut the door, and Scott turned and pushed Plaintiff in the chest. (*Id.*) At some point, Quinn stepped in to stop the altercation, and Plaintiff warned Scott never to touch him again. (*Id.*) Scott stepped back, allegedly "positioning himself as if reaching for his gun," when Plaintiff asked Scott whether he was "going for his gun," to which Scott responded, "I

don't need my fucking gun." (*Id.*)  After the altercation, Scott allegedly threatened to charge

Plaintiff with insubordination.  (*Id.* ¶ 33.)

Plaintiff alleges that, later in the same afternoon, Plaintiff "felt discomfort in his shoulder

and neck."  (*Id.* ¶ 34.)  Plaintiff avers that he was later diagnosed with a torn labrum and an

injured disc in his neck.  (*Id.*)[2]

On April 4, 2017, Plaintiff allegedly went to the Orange County District Attorney's office

to report the previous incident and other indications of alleged corruption in the Village.  (*Id.*

¶ 35.)  Plaintiff alleges that District Attorney Chris Borak ("Borak") refused to prosecute,

"claiming he would be unable to convince a jury that Scott intentionally hurt [Plaintiff]."  (*Id.*)

Plaintiff alleges that his injury "necessitated his leave" under worker's compensation, and he was

scheduled for surgery.  (*Id.*)  According to Plaintiff, while he was out on leave, Pierri became

Assistant Chief to replace Quinn, who was retiring.  (*Id.* ¶ 37.)  Pierri allegedly refused to let any

Town police officer speak to Plaintiff and prohibited Plaintiff from accessing any case papers or

entering the Town's police department, stating that it was because Plaintiff was supposed to be

on leave under worker's compensation.  (*Id.*)  At some point, Plaintiff stopped by the police

department, and Pierri allegedly said, "Not everyone is a Joe Cornetta fan."  (*Id.* ¶ 39.)  Plaintiff

also claims that he was invited to a "Guardian Angels" orientation, where Village and Town

residents complained about police inaction in combating drug-related crime.  (*Id.* ¶ 40.)

Although Plaintiff claims he attended in a "non-official capacity," Plaintiff later allegedly heard

---

[2] Although Plaintiff's Amended Complaint and opposition Memorandum refer to the injury as a "torn labium," (*see, e.g.*, Am. Compl. ¶ 34), Village Defendants point out that since Plaintiff is a man, this is likely a typographical error, and the alleged injury instead probably affected the labrum, a tissue in the shoulder socket, (Defs.' Reply Mem. 7 n.2).  The Court uses the word "labrum" where necessary.

from Quinn that Pierri believed that Plaintiff's attendance at the event was "insubordination." (*Id.*)

In July 2017, Pierri allegedly asked Plaintiff not to post anything "negative" about Town or Village officials on social media. (*Id.* ¶ 41.) Although Plaintiff agreed, he nevertheless later received a letter from the Town stating that he was in violation of the social media policy, and that the letter would be placed in Plaintiff's file. (*Id.*)

On November 6, 2017, while Plaintiff was still out on worker's compensation leave, D'Onofrio allegedly terminated Plaintiff from his job at the Village. (*Id.* ¶ 42.) Subsequently, in a meeting on January 10, 2018, Pierri "constructively terminated" Plaintiff from his duties in the Town by telling him that he would not allow Plaintiff to resume his duties as a detective upon his return from leave. (*Id.* ¶ 43.) Pierri also allegedly told Plaintiff not to return to the Town police department, threatened Plaintiff with possible criminal charges if he attempted to return to work, and "remained agitated and aggressive throughout the meeting." (*Id.*) Following the meeting, Pierri allegedly exhibited continued aggression, "chas[ing]" Plaintiff into the parking lot, continuing "verbal abuse," "demand[ing]" to know how old Plaintiff was, and shouting, "Don't come back! I am not putting you on the schedule" as well as "I'm ready for this fight!" (*Id.*) Plaintiff believed that the real reason he was terminated was "based on his disability and retaliation." (*Id.*)

Plaintiff lists many examples of alleged corruption and criminal activity conducted by D'Onofrio, Scott, Pierri, and DiSalvo. (*See id.* ¶¶ 76–85.) For example, according to Plaintiff, D'Onofrio used his political office to use Town and Village resources to harass political rivals, improperly entered campaign information on Village residents' sewer bills, solicited bribes from or used regulatory threats against business owners, and improperly provided business or personal

favors to citizens for their political support. (*See id*. ¶¶ 76(a)–(ee).) As to Scott, Plaintiff alleges that he resumed police duties in violation of his "Letter of Retirement," used his position to improperly arrest an individual with personal conflict with D'Onofrio's campaign manager's son, directed employees not to investigate individuals and citizens at the request of D'Onofrio and DiSalvo, and directed employees to "leave all drug dealers alone," as he received kickbacks from local drug dealers, along with D'Onofrio and DiSalvo. (*Id*. ¶¶ 78(a)–(j).) As to Pierri, who is not a party to Village Defendants' Motion, Plaintiff alleges that he prevented Plaintiff from accessing case papers and cut off contact between him and the Town police department. (*See id*. ¶¶ 80(a)–(b).) Finally, as to DiSalvo, Plaintiff alleges that he worked with D'Onofrio to pressure businesses and residents, assisted with favors to "certain individuals" for political gain, and helped impede police investigations and criminal charges against "certain individuals." (*Id*. ¶¶ 81(a)–(c).)

Based on the foregoing, Plaintiff asserts claims under RICO, averring that the loss of his job was a personal injury stemming from Defendants' purportedly fraudulent conduct, (*see id*. ¶ 108), and the ADA and NYSHRL, claiming discrimination, a hostile work environment, and retaliation as a result of Plaintiff's purported disability, (*see id*. ¶¶ 47–74).

B. Procedural Background

Plaintiff initiated this Action by filing a Complaint on December 20, 2018; there was a filing error with the original document, and the Complaint was refiled correctly on February 27, 2019. (*See* Dkt. No.1; Compl. (Dkt. No. 6).) On February 27, 2019, Plaintiff filed the operative Amended Complaint. (*See* Am. Compl.) In response to a Pre-Motion Letter from counsel for Village Defendants, the Court set a briefing schedule, thus obviating the need for a pre-motion conference. (*See* Dkt. No. 19.) On May 10, 2019, Village Defendants filed their opening papers.

(*See* Not. of Mot.; Village Defs.' Mem. in Supp. of Mot. ("Defs.' Mem."); Decl. of Michael A. Czolacz, Esq. in Supp. of Mot. ("Czolacz Decl.") (Dkt. Nos. 20–22).) On June 12, 2019, Plaintiff filed his Opposition. (*See* Pl.'s Mem. in Opp'n to Mot. ("Pl.'s Mem.") (Dkt. No. 23).) On July 2, 2019, Village Defendants filed their Reply. (*See* Defs.' Reply Mem.)

## II.  Discussion

### A.  Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Instead, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his or her] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than

the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

In considering Village Defendants' Motion, the Court is required to "accept as true all of the factual allegations contained in the [C]omplaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *see also Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014) (same). And, the Court must "draw[] all reasonable inferences in favor of the plaintiff." *Daniel v. T & M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Further, generally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (citation and quotation marks omitted).

B. Analysis

1. RICO Claim

Village Defendants move to dismiss the RICO claim, arguing that Plaintiff has failed to sufficiently allege that he was injured as a result of Village Defendants' alleged racketeering activity; that Plaintiff has failed to allege mail or wire fraud with the sufficient level of particularity mandated by Federal Rule 9(b); that the conduct that was alleged with some level of particularity does not constitute mail or wire fraud; and that the Village should be dismissed because, as a matter of law, municipal entities cannot be held liable under RICO. (*See* Defs.'

Mem. 4–7.)  Plaintiff responds that the alleged injury, Plaintiff's termination from his profession as detective, is sufficient to plausibly allege a RICO claim; that he is "self-assured" that reading the Amended Complaint in its entirety will sufficiently dispel any notions that the acts of fraud were not alleged with sufficient particularity; that the alleged conduct constitutes mail or wire fraud because it perpetuates Defendants' "scheme . . . to gain money and political power"; and that the Village itself qualifies as a "person" capable of liability under RICO.  (Pl.'s Mem. 9–16.) The Court addresses the arguments as needed.

Although the Supreme Court has noted that RICO is to "be liberally construed to effectuate its remedial purposes," *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 498 (1985) (citation and quotation marks omitted), courts have cautioned that, because "the 'mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation,'" *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) (alterations omitted) (quoting *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990)), *aff'd sub nom. Katzman v. Victoria's Secret Catalogue, Div. of The Ltd., Inc.*, 113 F.3d 1229 (2d Cir. 1997); *see also Aronov v. Mersini*, No. 14-CV-7998, 2015 WL 1780164, at *3 (S.D.N.Y. Apr. 20, 2015) (same); *Turner v. N.Y. Rosbruch/Harnik, Inc.*, 84 F. Supp. 3d 161, 167–68 (E.D.N.Y. 2015) (same); *Ferro v. Metro. Ctr. for Mental Health*, No. 13-CV-2347, 2014 WL 1265919, at *2 (S.D.N.Y. Mar. 27, 2014) (same), *reconsideration denied*, 2014 WL 2039132 (S.D.N.Y. May 16, 2014).

"A private cause of action under RICO requires that the plaintiff allege: '(1) the defendant's violation of 18 U.S.C. § 1962, (2) an injury to the plaintiff's business or property, and (3) causation of the injury by the defendant's violation.'"  *Fertitta v. Knoedler Gallery, LLC*,

No. 14-CV-2259, 2015 WL 374968, at *5 (S.D.N.Y. Jan. 29, 2015) (quoting *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 283 (2d Cir. 2006)). Turning to the first requirement, to establish a defendant's violation of 18 U.S.C. § 1962, a plaintiff must allege "the existence of seven constituent elements: (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir. 1983) (citation omitted), *cert. denied*, 465 U.S. 1025 (1984); *see also Aronov*, 2015 WL 1780164, at *3 (same). With regard to the racketeering activity requirement, the statute provides a list of criminal acts that can constitute predicate acts of racketeering. *See* 18 U.S.C. § 1961(1) (defining "racketeering activity"). Notably, mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 are predicate acts of racketeering activity, but crimes related to state election fraud are not. *See id.*

As to liability for the Village itself, some courts in this District have held that municipalities "cannot be liable under *respondeat superior* for a violation of RICO that is predicated upon [the] acts" of individual "municipal agents" acting with "criminal intent," at least in part because those courts have determined that a "municipal entity is incapable of forming the criminal intent necessary to support the alleged predicate offenses." *Nu-Life Constr. Corp. v. Bd. of Educ. of City of N.Y.*, 779 F. Supp. 248, 251 (E.D.N.Y. 1991) (citations and quotation marks omitted). A Second Circuit decision, *Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019), recently called that line of cases into question, at least as to certain forms of requested relief. In *Gingras*, the Second Circuit noted:

> Some district courts (and at least one treatise) endorse a rule that government entities, and their officers sued in their official capacities, cannot ordinarily be sued

under RICO.  At least as to suits for prospective, injunctive relief, their reasoning is not persuasive.  We agree with the Third Circuit that courts exempting municipalities from RICO liability on the ground that they are incapable of forming a RICO mens rea have failed to furnish a defensible explanation for their conclusion,  particularly given that private corporations are routinely held liable for damages under RICO.

922 F.3d at 124–25 (citations and italics omitted), *petition for cert. docketed*, No. 19-331 (Sept. 11, 2019).[3]  However, *Gingras* appears to be limited to situations where plaintiffs seek injunctive relief, because the Second Circuit acknowledged that the primary concern with permitting plaintiffs to assert RICO claims for damages against municipalities is the dilemma of "imposing the burden of punitive damages on taxpayers based on misconduct of a public official."  *Id*. at 125.  Thus, the Second Circuit has not necessarily disavowed the line of cases dismissing RICO claims for *damages* against municipalities.  *See id*.  Here, Plaintiff appears to claim both punitive damages *and* injunctive relief against all Defendants, including the Town and Village, raising

---

[3] In *Gingras*, the Second Circuit refers to the Third Circuit's discussion in *Genty v. Resolution Tr. Corp.*, 937 F.2d 899 (3d Cir. 1991).  There, the Third Circuit ultimately held that a civil RICO claim for treble damages "cannot be maintained against a municipal corporation" because it did not "perceive [any] intention of Congress to abrogate the long-established and salutary principle of common law prohibiting punitive damages against municipalities."  937 F.2d at 914.

However, in its analysis, the Third Circuit criticized the line of cases barring civil RICO damages against municipalities on the ground that municipalities are "incapable of forming a RICO mens rea," noting that no court has "defined what it meant by the term," or "attempted to analyze the elements of the mens rea required for the specific predicate offenses on which the RICO charges are structured," or "offered a principled basis for distinguishing how a municipality can 'form' the requisite intent to be liable for an isolated violation of a predicate offense but be incapable of forming such intent when the offense is part of a pattern of such crimes under RICO."  *Id*. at 909.  The Third Circuit pointed out that, in fact, "[m]unicipalities commonly *are* held civilly liable under state law for the torts of their agents which are accompanied by a specific or malicious intent," *id*. at 909–10 (emphasis added) (citation omitted), but ultimately concluded that it "need not decide . . . whether municipal corporations under RICO are an exception" to liability for its agents' wrongdoing, *id*. at 910, and went on to bar civil RICO claims on the ground that Congress did not intend for municipalities and their taxpayers to be financially responsible for the crimes of certain municipal agents, *see id*. at 912–14.

13

some tension as to whether one or both claims are legally viable against the municipalities. (*See* Am. Compl. 37–38.) This Court need not resolve that tension here because, as discussed below, Plaintiff has failed to plausibly allege that the alleged racketeering activity injured *his* business or property interests, requiring the dismissal of the civil RICO claims in their entirety.

Next, to fulfill the requisite element of two or more acts of "racketeering activity," *Moss*, 719 F.2d at 17, Plaintiff relies on allegations of wire and mail fraud, (*see* Am. Compl. ¶¶ 99–100). "The elements of wire fraud under 18 U.S.C. § 1343 are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate wires. The elements of mail fraud under 18 U.S.C. § 1341 are identical, except that mail fraud must be furthered by use of the mails." *Tymoshenko v. Firtash*, 57 F. Supp. 3d 311, 321 (S.D.N.Y. 2014) (citations and quotation marks omitted). "For both wire and mail fraud, the object of the scheme to defraud must be *money* or *property*." *Westchester Cty. Indep. Party v. Astorino*, 137 F. Supp. 3d 586, 600 (S.D.N.Y. 2015) (citing *United States v. Pierce*, 224 F.3d 158, 165 (2d Cir. 2000)) (emphasis in original). "A scheme to deceive, however dishonest the methods employed, is not a scheme to defraud in the absence of a property right for the scheme to interfere with." *Pierce*, 224 F.3d at 165 (citing *Carpenter v. United States*, 484 U.S. 19, 27–28 (1987)). As discussed in *Astorino*, although Congress enacted the Honest Services Fraud statute, which provided that wire or mail fraud includes schemes that "deprive another of the intangible right of honest services," subsequent Supreme Court cases limited the scope of the statute, ultimately leading to the current state of the law—that "the object of mail or wire fraud must be the deprivation of money or tangible or intangible property in the hands of the victim, and for honest services to be such

property, there must be a bribe or kickback and a violation of a fiduciary duty." *Astorino*, 137 F. Supp. 3d at 601–02 (citations and quotation marks omitted).

Here, Plaintiff argues that the fraud was perpetuated to deprive residents of "intangible property right[s]," such as "(1) participating in [the Village's] electoral process; (2) privacy when unsolicited political statements were issued with their personal utility bills; and (3) as a member of the public from receiving accurate information regarding their community." (Pl.'s Mem. 15.) However, none of these grounds listed, nor any alleged consequence listed in the Amended Complaint, identifies deprivation of any victim's *money* or *property* rights. Plaintiff is correct that the Supreme Court has indicated that mail and wire fraud may cover intangible property rights, but in that case, *Carpenter*, 484 U.S. at 25, the Supreme Court was referring to intangible items of value, such as confidential business information, which is, by any interpretation of the Amended Complaint, not part of the allegations here. Therefore, rather than the deprivation of "intangible property," Plaintiff's argument is more properly framed as an allegation of honest services fraud.

Moreover, basing wire or mail fraud claims on allegations of improperly securing fake absentee ballots or intimidating voters, ultimately leading to an allegedly rigged election, is not legally cognizable. Indeed, this Court has previously rejected the possibility that the public being "deprived of an intangible right to a free election" could constitute the basis of a viable allegation of wire or mail fraud. *Astorino*, 137 F. Supp. 3d at 606–07. However, *Astorino* also indicated that the taking of bribes or kickbacks *could* constitute a viable basis for wire or mail fraud. *See id.* at 602. Indeed, although "a pattern of self-dealing" could not constitute the basis of wire or mail fraud, allegations that a public official had "accepted bribes or kickbacks" could. *See United States v. Bahel*, 662 F.3d 610, 631–32 (2d Cir. 2011) (discussing *Skilling v. United*

*States*, 561 U.S. 358 (2010)).  Here, Plaintiff has alleged that Village Defendants all received kickbacks from local drug dealers in "exchange for no investigation into their illegal activities," (Am. Compl. ¶ 78(h)), and that at least D'Onofrio participated in a bribery scheme with the owner of a motel in the Village who needed board approval to make modifications to the hotel, (*id*. ¶ 76(e)).[4]  Moreover, there is at least one alleged instance of fraudulently depriving a government agency of money, (*see id*. ¶ 76(r)), as Plaintiff claims that D'Onofrio falsely reported that equipment was damaged from Hurricane Irene and received $1,000,000 on behalf of the Village from the Federal Emergency Management Agency ("FEMA").  Accordingly, it is theoretically possible that some of Defendants' actions may fall into the bribery exceptions contemplated in *Astorino*, 137 F. Supp. 3d 586, and *Bahel*, 662 F.3d 610.  However this Court need not and does not resolve the question of whether Plaintiff succeeds in plausibly alleging the existence of wire and mail fraud as the underlying racketeering activity, because, as discussed below, regardless of the *nature* of the alleged misconduct, Plaintiff fails to plausibly allege that it injured *his* business or property interests.

In the civil context, RICO allows only a plaintiff who is "injured in his business or property by reason of a [RICO] violation" to sue in court and potentially receive up to treble damages in compensation of the injuries.  18 U.S.C. § 1964(c).  "There are thus, two requirements for standing under [civil RICO]: (1) the plaintiff must show that there has been a violation of [18 U.S.C.] § 1962, and (2) he must show that his injury was caused by the violation."  *Hecht v. Comm. Clearing House*, 713 F. Supp. 72, 74 (S.D.N.Y. 1989) (citation, alterations, and quotation marks omitted), *aff'd*, 897 F.2d 21 (2d Cir. 1990).  The Second Circuit

---

[4] The Court notes however, that, none of the bribery or kickback allegations specifically allege that Village Defendants used the mail or interstate wire system to conduct such activity. (*See id*. ¶¶ 76(e), (cc); 78(h).)

has explained that "the reasonably foreseeable victims of a RICO violation are the targets, competitors and *intended* victims of the *racketeering* enterprise." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 124 (2d Cir. 2003) (emphasis added) (citation omitted), *cert. denied*, 540 U.S. 1012 (2003). "Courts routinely find that plaintiffs lack standing to bring a RICO claim, where the plaintiff's injuries are caused not by the RICO violations themselves, but by the exposure of those acts, or where the plaintiff seeks to recover for injuries caused by his refusal to aid and abet the violations." *Donelli v. County of Sullivan*, No. 07-CV-2157, 2009 WL 2365551, at *9 (S.D.N.Y. July 31, 2009) (citation, alterations, and quotation marks omitted); *see also Makowski v. United Broth. of Carpenters and Joiners of Am.*, No. 08-CV-6150, 2010 WL 3026510, at *10 (S.D.N.Y. Aug. 2, 2010) (same) (collecting cases).

Here, Plaintiff has not "explained how the injury . . . alleged—[Plaintiff's termination from Village duties and virtual termination from Town duties]—was caused by [Village Defendants'] alleged [bribery and kickback scheme]." *Donelli*, 2009 WL 2365551, at *9. The only injury that is plausibly personalized to Plaintiff's business or property is his termination from his duties as detective. (*See* Pl.'s Mem. 11.)[5] With regard to the RICO claim, therefore, the plausible connection between the illegal activities and the alleged injury would be that Plaintiff was terminated "because he would not keep quiet about the corruption" in the Village's mayoral office and police department. *Donelli*, 2009 WL 2365551, at *9. However, this precise theory for the personal injury component of a civil RICO claim has been rejected by the Second Circuit and other district courts within the Second Circuit. *See id.* ("The only allegation of a causal link between the alleged enterprise and the forced resignation is that the defendants forced [the

_____

[5] Even to the extent Plaintiff intends to rely upon his physical injuries from Scott's alleged assault, the assault was not "*caused* by" the RICO violation alleged here, i.e., wire or mail fraud. *Hecht*, 713 F. Supp. at 74 (emphasis in original) (citation omitted).

plaintiff] to resign because he would not keep quiet about the corruption in the [d]epartment. . . . However, allegations of injuries resulting from whistle blowing and non-participation in an enterprise are insufficient to confer standing for a civil RICO claim." (citations omitted)); *see also Hecht v. Comm. Clearing House*, 897 F.2d 21, 24 (2d Cir. 1990) (holding that the plaintiff lacked standing because the plaintiff's loss of employment was not proximately caused by racketeering activities because the plaintiff was neither "the target of the racketeering enterprise nor the competitor nor the customer of the racketeers" (citation, alterations, and quotation marks omitted)); *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 170–71 (S.D.N.Y. 2019) (holding that the plaintiffs failed to sufficiently allege civil RICO standing where they could only identify professional backlash and related economic consequences as their personal injuries); *Makowski*, 2010 WL 3026510, at *10 ("Courts generally hold that any injury flowing from . . . discharging the employee is not sufficiently proximate to the alleged RICO violations for standing purposes." (citation, alteration, and quotation marks omitted)). Therefore, Plaintiff's RICO claims are dismissed.[6]

---

[6] Because the Court dismisses the claims at this point in the inquiry, it does not reach the question of whether the Amended Complaint also fails to allege fraud with particularity, as required by Federal Rule 9(b). (*See* Defs.' Mem. 5–7.) Nevertheless, the Court notes that generic claims of fraud, such as "Defendants, through newspaper publications and statements on official government websites, fraudulently misrepresented to the residents of the Village," (Am. Compl. ¶ 100(b)), or "Defendants have[] mailed political materials in the utility bills of Village residents, [and] [t]hese bills, delivered by way of the U.S. mail, constitute mail fraud by Defendants," (*id.* ¶ 99(a)), routinely fail at the motion to dismiss stage, *see Moore v. PaineWebber, Inc.*, 189 F.3d 165, 172–73 (2d Cir. 1999) ("In the RICO context, Rule 9(b) calls for the complaint to specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." (citation and quotation marks omitted)); *Nelson v. Countrywide Home Loans, Inc.*, No. 18-CV-2081, 2019 WL 4762086, at *5 (D. Conn. Sept. 30, 2019) (dismissing RICO-related fraud allegations where the plaintiff failed to "identify any particular false or misleading statements" made by certain defendants; *Holmes v. Caliber Home Loans, Inc.*, No. 16-CV-3344, 2017 WL 3267766, at *9 (S.D.N.Y. July 31, 2017) (dismissing RICO claim where the plaintiff "allege[d] only that the

2. Disability-Related Claims

Village Defendants argue that Plaintiff's ADA discrimination claims against individual Village Defendants should be dismissed and that Plaintiff does not plausibly allege (1) that he is disabled, as defined by the ADA; (2) that he made any request for accommodation of any purported disability; (3) that he was subjected to a hostile work environment on the basis of his disability; and (4) that he engaged in any protected activity to merit a retaliation claim. (*See* Defs.' Mem. 7–13.) Plaintiff responds that he did qualify as disabled under the ADA; that he was not required to request reasonable accommodation in order to have a viable ADA claim; that his "banishment" from the police department constituted a hostile work environment based on disability; and that Plaintiff engaged in protected conduct by reporting Village Defendants' alleged corruption to the Orange County District Attorney's Office and through "filing several [other] complaints" regarding their alleged corruption. (*See* Pl.'s Mem. 16–22.) The Court addresses the arguments as needed.

a. Applicable Law

Disability discrimination claims under the ADA and the NYSHRL are analyzed under the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corporation v.*

---

documents . . . were fraudulent, without explaining why [they] were fraudulent"); *Curtis & Assocs., P.C. v. Law Offices of David M. Bushman, Esq.*, 758 F. Supp. 2d 153, 177 (E.D.N.Y. 2010) ("Thus, in complete contravention of Rule 9(b)'s pleading standard, [the] plaintiffs fail to identify *what* misrepresentations were made by [the] defendants, to *whom* the statements were made, *when* or *where* the statements were made, or *how* these statements were fraudulent or misleading." (citation omitted) (emphases in original)), *aff'd*, 443 F. App'x 582 (2d Cir. 2011). Contrary to what Plaintiff suggests, (*see* Pl.'s Mem. 12–13), the mere existence of the 38-page Amended Complaint alleging a litany of various forms of inappropriate behavior—although perhaps calling into question Village Defendants' integrity in general—does not necessarily sufficiently allege *fraud* pursuant to Federal Rule of Civil Procedure 9(b), which requires a party to state "with *particularity* the *circumstances constituting fraud* or mistake," Fed. R. Civ. P. 9(b) (emphases added).

*Green*, 411 U.S. 792 (1973). *See McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013). Under this test, a plaintiff must first establish a prima facie case of disability discrimination. *Id.* To do so, a plaintiff must demonstrate that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Id.* (citation omitted). If an employee establishes a prima facie case of discrimination, the burden shifts to the defendant-employer, who may rebut his claim with legitimate, non-discriminatory reasons for the adverse employment action. *See Sattar v. Johnson*, 129 F. Supp. 3d 123, 137 (S.D.N.Y. 2015) (collecting cases), *aff'd*, 669 F. App'x 1 (2d Cir. 2016). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–55 (1981) (citation omitted). If the defendant presents legitimate reasons for the employment action, the burden shifts back to the plaintiff to plausibly allege "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Sattar*, 129 F. Supp. 3d at 137 (quotation marks omitted) (citing *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)). "New York State disability discrimination claims are governed by the same legal standards as federal ADA claims." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004) (citation omitted). The Court will thus analyze the Plaintiff's ADA and NYSHRL discrimination claims in tandem. *See Novick v. Vill. of Wappingers Fall*s, 376 F. Supp. 3d 318, 342 (S.D.N.Y. 2019) (analyzing ADA and NYSHRL claims together).

The ADA prohibits employers from "discriminat[ing] against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  The NYSHRL contains a similar provision against retaliation, *see* N.Y. Exec. Law § 296(7), and is governed by the same standard, *see Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (applying ADA analysis to retaliation claim under both ADA and NYSHRL).

"Retaliation claims under the ADA are analyzed using the same framework applied in Title VII cases."  *Thompson v. City of New York*, No. 03-CV-4182, 2007 WL 4224370, at *4 (S.D.N.Y. Nov. 21, 2007) (citing *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001)), *adopted by* 2008 WL 294290 (S.D.N.Y. Feb. 1, 2008), *aff'd*, 348 F. App'x 643 (2d Cir. 2009).  To state a claim, a plaintiff must establish that: "[(1)] a plaintiff was engaged in protected activity; [(2)] the alleged retaliator knew that [the] plaintiff was involved in protected activity; [(3)] an adverse decision or course of action was taken against plaintiff; and [(4)] a causal connection exists between the protected activity and the adverse action."  *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 148 (2d Cir. 2002) (citation and quotation marks omitted); *accord McGuire-Welch v. House of the Good Shepherd*, 720 F. App'x 58, 62 (2d Cir. 2018).  "A plaintiff's burden at this prima facie stage is de minimis."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) (citation and italics omitted).

b.  Analysis

To begin, as a matter of law, individuals may not be held liable under the ADA, and Plaintiff does not appear to offer an argument to the contrary.  *See Spiegel v. Schulmann*, 604 F.3d 72, 79 (2d Cir. 2010) ("[I]n the context of employment discrimination, the retaliation

provision of the ADA[] . . . cannot provide for individual liability."); *Cerrato v. Durham*, 941 F. Supp. 388, 395 (S.D.N.Y. 1996) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995)).

However, in a critical departure from its analytical similarities with the ADA, plaintiffs "may be able to assert claims under the NYSHRL against [] individual defendants." *Rodriguez v. Morales*, No. 19-CV-4409, 2019 WL 2410046, at * 3 (S.D.N.Y. June 6, 2019) (citation omitted); *see also Tolbert v. Smith*, 790 F.3d 427, 434 n.3 (2d Cir. 2015) (noting that the NYSHRL provides for individual liability under an aiding-and-abetting theory). Accordingly, any ADA claims asserted against individual Village Defendants are dismissed, but similar, parallel claims made under the NYSHRL cannot be dismissed on these grounds. Nevertheless, there are further, substantive flaws with Plaintiff's claims.

To allege discrimination under either the ADA or NYSHRL, Plaintiff must show that he is disabled within the meaning of the statutory schemes and related case law, which is that a qualifying disability "must limit a major life activity and the limitation must be substantial." *Pugliese v. Verizon N.Y., Inc.*, No. 05-CV-4005, 2008 WL 2882092, at *1 (S.D.N.Y. July 9, 2008) (citation omitted). "Factors to consider in determining whether a major life activity is substantially limited include: the nature and severity of the impairment; its duration or expected duration; and the existence of any actual or expected permanent or long term impact." *Capobianco v. City of New York*, 422 F.3d 47, 57 (2d Cir. 2005) (citing 29 C.F.R. § 1630.2(j)(2)). However, "[t]he regulations make clear that the 'inability to perform in a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Colwell v. Suffolk Cty. Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998) (quoting 29 C.F.R. § 1630.2(j)(3)(1)), *cert. denied*, 526 U.S. 1018 (1999). Here, Plaintiff's disability claim is grounded on his allegedly torn labrum and "an injured disc in his neck," for which Plaintiff

alleges he was "scheduled for surgery." (Am. Compl. ¶¶ 34, 36.) Plaintiff alleges no details about the physical limitations imposed by the injuries other than alleging that they "necessitated his leave" under worker's compensation. (*Id*. ¶ 36.) The allegations regarding these injuries are insufficient as Plaintiff provides no allegations about the extent of Plaintiff's injuries, how long Plaintiff's expected recovery was, or what particular tasks Plaintiff believed he was qualified to do even with the injury. Although the injury may have required surgery, that does not mean that it qualified as a disability under the ADA or NYSHRL, and indeed, even more serious and more specifically alleged injuries have been deemed not to qualify as disabilities because they "did not have the required duration or long-term impact." *Fagan v. United Intern. Ins. Co.*, 128 F. Supp. 2d 182, 185–86 (S.D.N.Y. 2001) (holding that the plaintiff did not sufficiently allege the existence of a disability despite undergoing multiple surgeries*); see also Colwell*, 158 F.3d at 646 (noting that "a seven-month impairment" from a cerebral hemorrhage, with "non-particularized and unspecific residual limitations described on [the plaintiff's] police work, is of too short a duration and too vague an extent to be substantially limiting" (citation and quotation marks omitted)); *Rosen v. N.Y.C. Dep't of Educ.*, No. 18-CV-6670, 2019 WL 4039958, at *5 (S.D.N.Y. Aug. 27, 2019) (dismissing ADA claims where the plaintiff failed to explain how "various surgeries . . . constitute a disability under the meaning of the ADA" (citation, alteration, and quotation marks omitted)); *Walker v. Consolidated Edison Co. of N.Y., Inc.*, No. 00-CV-8598, 2002 WL 31385830, at *5 (S.D.N.Y. Oct. 22, 2002) (holding that injuries requiring knee surgery did not qualify as a disability under the ADA and noting that, generally, "[a] temporary inability to work after surgery does not constitute a 'disability' under the ADA" (citation omitted)); *see also Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 88 (2d Cir. 2010) (noting that where an impairment can be "easily accommodated" by a simple alteration in

work environment, such an impairment cannot qualify as a disability under the ADA).  Because Plaintiff's claims fail at the second step of the inquiry, any claim based on disability discrimination is dismissed.

As to any claim of a hostile work environment under either the ADA or NYSHRL, there are simply no allegations in the Amended Complaint at all that suggest that Village Defendants created a hostile work environment *because* of Plaintiff's purported disability.  *See De Figueroa v. New York*, 403 F. Supp. 3d 133, 161 (S.D.N.Y. 2019) ("Because [the p]laintiff has failed to allege facts that give rise to an inference that [the d]efendants' allegedly hostile conduct was motivated by her disability, her hostile work environment claims under the ADA . . . fail."); *Lewis v. Blackman Plumbing Supply LLC*, 51 F. Supp. 3d 289, 309 (S.D.N.Y. 2014) ("To substantiate a hostile-work environment claim, a plaintiff must allege facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive . . . (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive, . . . and (3) creates such an environment *because of the plaintiff's disability*." (emphasis added) (citation, alteration, and quotation marks omitted)); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584–85 (S.D.N.Y. 2008) (noting that although "the ADA encompasses hostile work environment claims," the standard is a "demanding one," and the plaintiff's claim should be dismissed because there was "no evidence that the [work] environment . . . was permeated with frequent,

severe and offensive *disability-related* comments" (emphasis added) (footnotes and quotation marks omitted)). [7]  Accordingly, any hostile environment claims are also dismissed.[8]

Plaintiff's ADA and NYSHRL disability-related retaliation claims also fail.  Even assuming Plaintiff has plausibly alleged that he has a qualifying disability—which, as discussed above, he has not—none of Plaintiff's allegations suggests that he engaged in "protected activity," which in this context, "refers to action taken to protest or oppose statutorily prohibited *discrimination*."  *Rajcoomar v. Bd. of Educ.*, No. 16-CV-1682, 2017 WL 980616, at *6 (S.D.N.Y. Mar. 13, 2017) (quoting *Wright v. Monroe Cmty. Hosp.*, 493 F. App'x 233, 236 (2d Cir. 2012)) (emphasis added) (quotation marks omitted).  The employee's "complaint must be sufficiently pointed to be reasonably understood as a complaint of discrimination." *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456, 2013 WL 1211496, at *9 (E.D.N.Y. Mar. 25, 2013) (citation and quotation marks omitted), *aff'd*, 597 F. App'x 19 (2d Cir. 2015); *see also Talwar v. Staten Island Univ. Hosp.*, 610 F. App'x 28, 30 (2d Cir. 2015) (holding that a plaintiff "must allege that [her employer was] on notice that [her] complaints were about [statutorily prohibited] discrimination, not just general unsatisfactory or unfair conduct").  Although Plaintiff may have complained to Village Defendants and to others about Village Defendants' alleged political inefficacy and corruption, nothing in the Amended Complaint alleges any instance of Plaintiff engaging in complaints about disability

---

[7] Instead, the Amended Complaint makes a number of allegations about threats or assaults Plaintiff experienced because he reported Village Defendants' purported *corruption*, an issue entirely separate from Plaintiff's putative disability.  (*See, e.g.*, Am. Compl. ¶¶ 25, 26, 30–32.)

[8] "Hostile work environment . . . claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 609 (2d Cir. 2006) (citations omitted).

discrimination.[9]  When pressed for arguments about how Plaintiff engaged in qualifying

protected activity, in his Opposition, Plaintiff is only able to point to complaints of Village

Defendants' alleged "illegal acts," corruption, and intimidation, and, critically, no incident that

could be construed as a complaint—formal or informal—of disability discrimination.  (Pl.'s

Mem. 21.)  Accordingly, Plaintiff's retaliation claims are also dismissed.  *See Nieblas-Love v.

N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 75 (S.D.N.Y. 2016) (dismissing ADA retaliation claims

where there was no evidence that "[the plaintiff's] termination . . . was in any way connected to

his requests for additional [disability] accommodations"); *Goonewardena*, 2013 WL 1211496, at

*9–10 (dismissing retaliation claim where the plaintiff's purported protected activity did not

"contain any language that could reasonably be understood to be a complaint of discrimination

on the basis of disability"); *Williams v. N.Y.C. Hous. Auth.*, No. 07-CV-7587, 2009 WL 804137,

at *8 (S.D.N.Y. Mar. 26, 2009) (dismissing the plaintiff's retaliation claim in part because her

complaints to the employer pertained to workplace conditions, not disability discrimination),

*aff'd* 408 F. App'x 389 (2d. Cir. 2010); *see also Difillippo v. Special Metals Corp.*, No. 13-CV-

215, 2016 WL 4621087, at *8 (N.D.N.Y. Sept. 6, 2016) (noting that retaliation claims under the

ADA and NYSHRL are both analyzed under the same framework (citing *Krasner v. City of N.Y.*,

580 F. App'x 1, 3–4 (2d Cir. 2010))).

---

[9] Nor has Plaintiff alleged anywhere in his Amended Complaint retaliation claims in violation of the First Amendment or that Plaintiff belonged to any other form of protected class or made such arguments in his Opposition.  (*See* Am. Compl. ¶¶ 57–60 (alleging retaliation under the ADA specifically), 61–67 (alleging retaliation under the N.Y. Exec. Law § 296, which covers discrimination and retaliation based on certain protected classes, such as disability, and that "Plaintiff is a member of a protected class pursuant to [N.Y. Exec. Law] § 296"); Pl.'s Mem. 20–22.)

## III. Conclusion

For the reasons stated herein, Village Defendants' Motion To Dismiss is granted. Because this is the first adjudication on the merits of Plaintiff's claims, the dismissal is without prejudice. If Plaintiff wishes to file a second amended complaint, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff should include within that amended complaint all changes to correct the deficiencies identified in this Opinion & Order that Plaintiff wishes the Court to consider. Plaintiff is advised that the second amended complaint will replace, not supplement, the Amended Complaint. The second amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, his claims may be dismissed with prejudice.

The Clerk is respectfully directed to terminate the pending Motion. (Dkt. No. 20.)

SO ORDERED.

DATED:     January 22, 2020
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

27